**NEW YORK LIFE INS. CO. v. STONE.**

**No. 3063.**

Circuit Court of Appeals, First Circuit.
Nov. 27, 1935.

MORTON, Circuit Judge, dissenting.

F. H. Nash and Charles P. Curtis, both of Boston, Mass. (Louis H. Cooke, of New York City, and Bailey Aldrich, of Boston, Mass., on the brief), for appellant.

Bennett Sanderson, of Boston, Mass. (Geoffrey Bolton, of Boston, Mass., on the brief), for appellee.

Before BINGHAM and MORTON, Circuit Judges, and PETERS, District Judge.

BINGHAM, Circuit Judge.

This is an action at law brought against the Insurance Company to recover the double indemnity provided for in each of two policies issued by it on the life of Charles F. Wheeler. In one of the policies the plaintiff was made the beneficiary. The other was made payable to Wheeler's estate, but since his death has been assigned by his administrator to the plaintiff, who now owns it.

The declaration contains two counts. The first is based upon the policy dated

August 9, 1929, wherein it was provided that the defendant insured the life of Wheeler in the sum of $3,000, or the sum of $6,000 in case the "death of the insured resulted, directly and independently of all other causes, from bodily injury effected solely through external, violent and accidental means and occurred within ninety days after such injury." The second policy was dated September 14, 1927, and insured the life of Wheeler in the sum of $2,000, or the sum of four thousand in case the death of the insured resulted in the same manner and within the same time after injury.

In each count it is alleged that the insured duly paid the premiums provided for in the policies and that, while the policies remained in force, Wheeler, on December 10, 1932, suffered bodily injury solely through external, violent and accidental means—a pistol wound and blows—and died within ninety days thereafter, and that his death resulted directly and independently of all other causes from said bodily injury; that due proof of his death and of the means of his death were furnished the defendant; that thereafter the defendant paid the plaintiff under the first policy the sum of $3,024.83, it being the single indemnity plus interest under that policy, but did not pay the plaintiff the balance due thereunder of $3,000 and interest; that the defendant had paid the single indemnity with interest under the second policy, but had not paid the balance due of $2,000 with interest.

The defendant in its answer denied each and every material allegation in the plaintiff's writ and declaration.

The trial was had in the District Court for Massachusetts before a jury. At the close of all the evidence the defendant's motion for a directed verdict was denied and its exception saved. The jury returned a verdict reading as follows:

"The jury find for the plaintiff and assess damages in the sum of five thousand ($5,000) dollars. But if as a matter of law, the defendant is entitled to a verdict, the jury find for the defendant and consent that this verdict may be entered on order of the United States District Court for the District of Massachusetts or of the United States Circuit Court of Appeals for the First Circuit, or of the Supreme Court of the United States with the same effect as if returned by them."

Thereafter the defendant filed a motion requesting the court to enter a verdict in its favor. This motion was denied, and, on July 23, 1935, judgment was entered for the plaintiff in the sum of $5,000 damages, with interest from the dates of demand to the date of judgment, and for costs.

The double indemnity provision is the same in both policies and is as follows:

"The double indemnity provided on the first page hereof shall be payable upon receipt of due proof that the death of the insured resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental means and occurred within ninety days after such injury.

"Double indemnity shall not be payable if the insured's death resulted from self-destruction, whether sane or insane; from the taking of poison or inhaling of gas, whether voluntary or otherwise; from committing an assault or felony; from war or any act incident thereto; from engaging in riot or insurrection; from participation as a passenger or otherwise in aviation or aeronautics; or, directly or indirectly, from infirmity of mind or body, from illness or disease, or from any bacterial infection other than bacterial infection occurring in consequence of accidental and external bodily injury. The company shall have the right and opportunity to examine the body, and to make an autopsy unless prohibited by law."

So far as the charge to the jury is concerned, the record does not disclose that any exceptions were saved or errors assigned. It will, however, be useful to refer to the charge for the purpose of making it clear just what issues were submitted to the jury. It there appears that the court instructed the jury that "no controversy exists as to the fact that the death of Charles F. Wheeler resulted from external and violent means"; that the question was whether "it resulted from accidental means or from self-destruction, whether sane or insane"; that counsel "agree that the burden of showing, by a fair preponderance of the evidence, that the insured's death was accidental, not suicidal, rests upon the plaintiff"; that, if the plaintiff had sustained that burden their verdict should be for her, otherwise for the defendant; and, after stating there was a presumption against suicide, that it was not a conclusive one but a presump-

tion of fact which stood until overthrown by evidence, and that "where substantial evidence of death by self-inflicted injury appears, the presumption against suicide is not at all conclusive." The court further stated:

"If evidence or facts and circumstances tending to show suicide are of greater or even of equal weight with the presumption and such evidence as there may be against suicide, then it is the duty of the tribunal whose province it is to determine the facts to find that a person died by self-inflicted wounds"; that they were to put on one side "the presumption or inference against suicide, and add to it any evidence that there is in the case against suicide. Then you look at the evidence on the other side, no matter whence it comes, determine its credibility, giving due weight to all the evidence and presumptions in the case, including the presumption against murder, as well as the presumption against suicide, and determine whether or not the plaintiff has sustained the burden of showing that the death of Charles F. Wheeler was caused by an accident and not by self-inflicted wounds, whether he was sane or insane at the time."

And after consulting with counsel said:

"I may not have made it clear to you, and there should be no obscurity about it, that the words 'accidental means' as used in the policy have the meaning of happening unexpectedly without intention or design on the part of the insured, and if Charles F. Wheeler was murdered he suffered from an accident within the terms of the policy, and the plaintiff would, if Charles F. Wheeler was murdered, be entitled to recover. It is not essential that the plaintiff prove by whom the fatal shot was fired or the exact manner in which it was fired, but it is incumbent upon the plaintiff to show that Charles F. Wheeler did not commit suicide, as explained to you in the course of my charge."

■ These instructions not being here in question, we are not called upon to determine whether they are correct or not. They stand as the law of the case. From them it appears the jury were in substance told that, if the shot that produced Wheeler's death was without intention or design on his part, it was accidental, whether the revolver, at the time of its discharge, was in his own hand or that of another; and that it was likewise accidental within the terms of the policy if

the shot that effected Wheeler's death was fired by one other than Wheeler with the intent and design to murder Wheeler, and was murder.

■ In view of these instructions, we will first consider whether there was any substantial evidence from which it could be found that the shot that killed Wheeler was fired by a person other than Wheeler with intent to murder. This becomes important in view of the fact that the court charged the jury that, if he was murdered, his death was produced by accidental means within the terms of the policy.

After a careful study of the case, we are of the opinion that there was no substantial evidence from which it reasonably could be found that the shot that caused Wheeler's death was fired by any one other than Wheeler, and that this is so irrespective of the presumption that he was not murdered.

The evidence disclosed that the only person or persons, other than Wheeler himself, who could have fired the shot that effected his death were Raino Kivela and Hazel Oikelmus; that the former, at the time in question, was an employee of Wheeler and a long-time friend and companion, whose relations with Wheeler were in nowise other than the best, while the latter was a woman he had brought to his home and who was to marry him and there reside. There is no evidence to show that either she or Kivela were other than on the best of terms with Wheeler or that either of them had any motive for shooting him or would have in any way benefited by his death. On the contrary the only reasonable inference from the evidence is that his death would be to their detriment.

The fatal shooting occurred at Wheeler's house in New Ipswich, N. H., on the 10th of December, 1932, at 12 o'clock noon or a few minutes thereafter. Wheeler was in the living room, off the kitchen, listening to the radio, when Kivela came from his work into the kitchen for dinner. The dinner had been prepared by Hazel and she was at work about the dining table in the kitchen. The door from the kitchen to the living room was open. The testimony of these two persons was that shortly after Kivela came into the kitchen Wheeler was called for dinner; that while Kivela stood at the sink washing himself and while Hazel's little girl, four years of age, was playing on the floor, Wheeler

appeared at the living room door holding up a revolver and, shouting "here goes," discharged it; that, frightened at what was taking place, Kivela and Hazel ran out of the kitchen, through the entry-way leading to the woodshed and cement platform; and that they heard two shots fired. It is uncontroverted that three shots were fired, and it is certain that the first two shots went into the ceiling of the living room above the right half of the living room door, and that the third shot was a contact shot, the muzzle of the revolver having been pressed firmly against Wheeler's forehead a little to the left of the median line; that this was the shot that caused his death; that the explosion of the gas from the revolver took place within the skull; that the expansion thus caused fractured the skull and tore a long hole in the scalp through which blood and brain matter exuded; and that the bullet was found at the rear of the skull cavity. Whether the failure of Hazel and Kivela to hear the third shot was due to their fright when they rushed out of the kitchen or on account of the report being dead-ened because the muzzle of the revolver was pressed hard against Wheeler's fore-head and caused the explosion of the gas to take place in the skull, does not appear, but it was probably attributable to both.

It is certain, however, that three shots were fired. The bullets of the first two shots were dug out of the ceiling of the living room above the right half of the door and the third, as above stated, out of Wheeler's head. The revolver was so constructed that, after each shot, it dis-charged the exploded shell, throwing it up and some six feet or more to the right of the barrel of the revolver. Two of the shells were found in the living room, to the right of the door. The third shell was found on the floor of the kitchen. When the third shot was fired, if Wheeler was standing in the doorway of the living room, as Kivela and Hazel testified, with the gun in his right hand (he was a right-hand shot), on firing the third shot he must have turned the muzzle of the gun towards him and placed it against his forehead (the shot was a contact one) and in so doing, if he stood at the time he fell as the evidence shows he did, the right side of the revolver would be to-wards the kitchen and the ejected shell would be thrown into the kitchen, for it is unquestioned on the evidence that he fell on his back parallel with the line of the wall between the living room and the kitchen and to the left of the doorway with his feet near the doorway and the pistol, which was his own, lying at his feet. This was the position in which he was found according to all the evidence, whether of the plaintiff or of the defend-ant.

There is no evidence, direct or circum-stantial, of what took place at the time of the shooting, that contradicts in any mate-rial respect the testimony of the witness-es Kivela and Hazel. On the contrary the situation shown to exist immediately fol-lowing the shooting discloses facts and circumstances that confirm and substan-tiate their testimony.

If the jury found that the shooting was accidental because the shot that killed Wheeler was fired by Kivela or Hazel, the only persons besides Wheeler who could have done so, it was pure guess-work. And if they found that the fatal shot, though fired by Wheeler, was acci-dental, it was likewise guesswork and un-supported by the evidence. That three shots were fired, two of which went into the ceiling and the third into Wheeler's skull, demonstrated beyond question to a reasonable mind that the fatal shot was not accidental. One does not fire three shots in succession accidentally, and par-ticularly so when, on firing the third shot, he presses the muzzle against his forehead, a contact shot, as was shown to have been the case here.

The motion for a directed verdict should have been granted. The motion for entry of the alternative verdict in fa-vor of the defendant should likewise have been granted.

Our order is:

The judgment of the District Court is vacated, the verdict set aside, and the case is remanded to that court with di-rections to enter the alternative verdict and a judgment for the defendant, appel-lant, with costs to it in both courts.

MORTON, Circuit Judge, inclines to think that the great difficulty which a person would have in inflicting on himself such a wound as caused Wheeler's death, the position of his body, the unexplained contused wound on the left side of his head, the entire absence of any known motive for suicide or disposition towards it together with actions by Wheeler that forenoon clearly indicating an expectation

of continued life, and the evidence as to other facts which if true might be thought inconsistent with suicide, made it proper to submit to the jury the question how Wheeler came to his death.